```
 1                    UNITED STATES DISTRICT COURT
                     EASTERN DISTRICT OF MICHIGAN
 2                        SOUTHERN DIVISION

 3

 4    UNITED STATES OF AMERICA,

 5                   Plaintiff,

 6    -v-                                    Case No. 19-cr-20096

 7

      DEVIN JAMAL WALKER,
 8

                     Defendant.
 9    _____/

10

11                       SENTENCING HEARING

12            BEFORE THE HONORABLE MARK A. GOLDSMITH

13          Detroit, Michigan, Monday, June 28th, 2021.

14

15    APPEARANCES:

16    FOR THE PLAINTIFF:        ALYSE WU
                                U.S. DEPARTMENT OF JUSTICE
17                              211 W. Fort Street, Room 2001
                                Detroit, MI 48226
18

19
      FOR THE DEFENDANT:        RHONDA BRAZILE
20                              Federal Community Defender
                                613 Abbott
21                              Fifth Floor
                                Detroit, MI  48226
22

23
      David B. Yarbrough, CSR, RMR, FCRR
24    Official Court Reporter
      (313) 234-2619
25
```

TABLE OF CONTENTS

PAGE

WITNESSES:

NONE




EXHIBITS

NONE

```
1              Detroit, Michigan.
2              Monday, June 28th, 2021.
3              At or about 2:12 p.m.
4                        --      ---     --
5              THE CLERK OF THE COURT:  Please rise.  The United
6   States District Court for the Eastern District of Michigan is
7   now in session, the Honorable Mark Goldsmith presiding.
8   You may be seated.  The Court calls case number 19-20096, the
9   United States of America versus Devin Walker.  Counsel, please
10  place your appearance on the record.
11             MS. WU:  Good afternoon, your Honor.  Alyce Wu on
12  behalf of the United States.
13             MS. BRAZILE:  Good afternoon, your Honor.  Rhonda
14  Brazile of the Federal Community Defender Office on behalf of
15  Mr. Devin Walker who is seated in front of me in juxtaposition.
16             THE COURT:  All right.  Good afternoon.  Everyone can
17  remain seated when you speak because you want to make sure
18  everyone talks in a microphone so we all can hear you.  I know
19  we're all masked and so it can be a bit of a challenge, so
20  please speak up and speak distinctly.
21             Today is the date and time set for sentencing.  Are
22  we all ready to proceed then?
23             MS. WU:  The government is, your Honor.
24             MS. BRAZILE:  The defense is, your Honor.
25             THE COURT:  All right.  Now we had initiated the
```

1  effort to sentence the defendant back in 2019.  We adjourned it

2  so that we could get a psych evaluation.  The pandemic made

3  that more difficult.  We now have the psychological evaluation

4  and so now we are proceeding.  Now I'm looking at the

5  presentence investigation report that was revised July 9, 2019.

6  Is that the latest version then?

7          MS. WU:  That's the latest version that I have, your

8  Honor.

9          MS. BRAZILE:  I actually don't have in my possession

10  that latest version, your Honor.  May I go to the probation

11  officer who's present in the courtroom today?

12          THE COURT:  Okay.

13          MS. BRAZILE:  May I approach him?

14          THE COURT:  Go ahead.

15          MS. BRAZILE:  Thank you, your Honor.

16          (Pause)

17          MS. BRAZILE:  Thank you, your Honor.  He's provided

18  me a copy of that.

19          THE COURT:  All right.  Ms. Brazile, have you gone

20  over the presentence investigation report with Mr. Walker?

21          MS. BRAZILE:  I did, your Honor, umm, the version

22  that we did go over and I do believe I may have said to him --

23          THE COURT:  You're going to have to speak more into

24  the microphone, ma'am, so I can hear you.

25          MS. BRAZILE:  I'm so sorry, your Honor.  I did review

1   the presentence report with Mr. Walker and I do believe I sent

2   to him a copy of the revised.  I simply didn't have it with me

3   today.  So yes, your Honor, the answer is yes.

4          THE COURT:  All right.  Are there any corrections or

5   additions to the report from the government?

6          MS. WU:  No.  Thank you, your Honor.

7          THE COURT:  Anything for the defense?

8          MS. BRAZILE:  Yes, your Honor.  One minor correction

9   and that was with the number of images.  It does not alter the

10  guideline calculation, but the true number for the number of

11  images from my calculation should be 2,430 images.  That is

12  accounting for the 31 videos and the 105 images combined.  The

13  number that's reflected in the presentence report of 2,925

14  images appears to be a miscount.  That's the only correction.

15  Again, it does not change the guideline calculation.

16         THE COURT:  Are you talking about paragraph 30?

17         MS. BRAZILE:  I'm talking about paragraph 30 and

18  paragraph 20, your Honor.  On page seven is paragraph 20 and

19  paragraph 30 appears on page eight.

20         THE COURT:  All right.  You believe the number of

21  images should be what?

22         MS. BRAZILE:  2,420 and that is accounting for the

23  calculation of the 31 videos and the 105 additional images

24  separate from the videos.

25         THE COURT:  All right.  What's the view of the

1    government about that?

2         MS. WU:  Your Honor, I, umm, Ms. Brazile did not

3    raise this objection before so I have not had a chance to look

4    into a calculation issue.  It sounds like Ms. Brazile's not

5    asserting that there's any impact on the guideline calculation,

6    so I don't know that, umm, that issue needs to be resolved for

7    purposes of moving forward with sentencing.

8         MS. BRAZILE:  Ms. Wu is correct, your Honor.  This is

9    a minor correction rather than an objection.

10        THE COURT:  All right.  Does probation have a view

11   about this?

12        PROBATION OFFICER LUKE:  Your Honor --

13        THE COURT:  Please identify yourself, please?

14        PROBATION OFFICER LUKE:  My name is Robert Luke.  I'm

15   with the probation department.  We would really take no view.

16   As the government stated, this was not brought up prior to

17   sentencing and admittedly I'm not the writer who completed the

18   report, I'm standing in for her this afternoon so I really

19   don't have a stance at this time.

20        THE COURT:  All right.  Ms. Brazile, can you go over

21   how you arrived at 2,420 images?

22        MS. BRAZILE:  Yes, your Honor.  On pages seven,

23   paragraph 20 and on pages, on page eight, paragraph 30 and I'm

24   going use page eight, paragraph 30 specifically because it

25   indicates that there were 105 images and 31 videos and for

1  purposes of the guideline calculation, each video is equal to

2  75 images and they, the probation department, indicates that

3  that would equal 2,325 images for each or for the videos.  If

4  that is the total number of images for the videos, if you add

5  the 105 separate images, the total calculation should be 2,420.

6  Like I said, your Honor, it's a minor calculation issue and not

7  affecting the guidelines because the guidelines apply if there

8  are 600 or more images anyway.

9          THE COURT:  All right.  Well, I think what we can do

10  is add to the report the defense view of how many images it

11  believes were involved.  Everyone agrees that it does not

12  impact the guidelines and doesn't appear to be material.  It

13  wouldn't make any difference in my assessment of an appropriate

14  sentence whether the report as originally written or the

15  defense view on the number of images is correct, but I think

16  the report should reflect that the defense has a different

17  calculation so let's put that in paragraphs 20 and 30.  Anyone

18  have an objection to proceeding in that fashion?

19          MS. WU:  No.  Thank you, your Honor.

20          MS. BRAZILE:  No, your Honor.  Thank you.

21          THE COURT:  All right.  Now Ms. Brazile, anything

22  else to add or correct to the report?

23          MS. BRAZILE:  Umm, no, your Honor.

24          THE COURT:  All right.  The Court has reviewed the

25  report then and accepts it, adopts statements in it as its

1    findings.  The defendant is before the Court for sentencing

2    having pled guilty to count one which was receiving child

3    pornography.  The defendant pled guilty to the count.  The

4    guilty plea was accepted.  The Rule 11 Plea Agreement was taken

5    under advisement.  Are both sides still urging the Court to

6    adopt the Rule 11 Plea Agreement?

7              MS. WU:  The government is, your Honor.

8              MS. BRAZILE:  The defendant is, your Honor.

9              THE COURT:  All right.  The Court does accept the

10   Rule 11 Plea Agreement.  Let's turn to the calculation of

11   guidelines.  They are advisory and not mandatory, but we do

12   need to calculate them.  The presentence investigation report

13   calculated the guidelines as follows:

14             With regard to count one, receiving and attempting to

15   receive child pornography, base offense level is 22.  Seven

16   levels are added because the offense involved distribution to a

17   minor that was intended to persuade, induce, entice, coerce or

18   facilitate travel of the minor to engage in prohibited sexual

19   conduct.  For levels are added because the material portrays

20   sadistic or masochistic conduct or other depictions of

21   violence.  Five levels are added because the defendant engaged

22   in a pattern of activity involving sexual abuse or exploitation

23   of a minor.  Two levels are added because of the use of a

24   computer or an interactive computer service.  Five levels are

25   added because the offense involved 600 or more images.  Three

1    levels are deducted because the defendant accepted

2    responsibility and that brings us to a total offense level of

3    42.  Is everyone in agreement with that?

4            MS. WU:  The government is in agreement, your Honor.

5    Thank you.

6            MS. BRAZILE:  The defense believes that's the correct

7    guideline calculation, your Honor.

8            THE COURT:  Turning to criminal history, the

9    defendant has no criminal history points and that places him in

10   category one.  Is everyone in agreement with that?

11           MS. WU:  That's the government's understanding as

12   well, your Honor.

13           MS. BRAZILE:  The defense is in agreement, your

14   Honor.

15           MS. WU:  With a total offense level of 42 and a

16   criminal history category of one, the guideline imprisonment

17   range is 360 months to life, however because the statutory

18   maximum is 20 years, the guideline term of imprisonment is 240

19   months.  Is everyone in agreement with that?

20           MS. WU:  The government is, your Honor.

21           MS. BRAZILE:  The defense agrees that's the statutory

22   maximum, your Honor.

23           THE COURT:  Well, I was asking about the guideline.

24           MS. BRAZILE:  Yes, your Honor.  That becomes the

25   guidelines, we do agree.

1          THE COURT:  All right.  Let's turn to sentencing

2     options.  Under the statute, there's a minimum term of

3     imprisonment of five years and a maximum of 20 years.  As just

4     indicated, the guideline term of imprisonment is 20 years.  The

5     guideline -- pardon me, the Rule 11 Plea Agreement provided for

6     a sentence that may not exceed 240 months and must be at least

7     five years.

8          With respect to supervised release, the statute

9     provides for five years to life.  Same is true under the

10    guidelines.  With respect to probation, the defendant is not

11    eligible under the statute and under the guidelines.  With

12    respect to fines, the statute provides for a maximum fine of

13    250,000 dollars and there's also a mandatory special assessment

14    of 100 dollars.  There's also a 5,000 dollar assessment under a

15    separate statute.  The fine range is 50,000 dollars to 250,000

16    dollars.  Restitution is mandatory for any victims of the

17    offense.  Is everyone in agreement with that recitation of our

18    sentencing options?

19          MS. WU:  Yes, your Honor.

20          MS. BRAZILE:  Yes, your Honor.

21          THE COURT:  All right.  At this time I'll invite Ms.

22    Brazile to speak on behalf of Mr. Walker.  Then, Mr. Walker,

23    you can address the Court directly if you want to.  I will then

24    hear from Ms. Wu on behalf of the government.  If there are any

25    victims of the offense who want to speak, this will be their

1    opportunity as well to speak.  All right, Ms. Brazile?

2          MS. BRAZILE:  Thank you, your Honor.

3          THE COURT:  You can remain seated if you want to if

4    it's easier to speak into a microphone.  Up to you.

5          MS. BRAZILE:  Can you hear me, your Honor?  Can you

6    hear me?

7          THE COURT:  Yes, I can.

8          MS. BRAZILE:  Okay.  I will remain standing then.

9    Thank you, your Honor.  If it please the Court, it has been

10   some time since I've seen you in person.  I'm glad that

11   everyone is well in our extraordinary circumstances.  This is

12   also an extraordinary case, your Honor.  I did send to the

13   Court a supplemental sentencing memorandum.  I hope that the

14   Court did receive that as well as probation and the government.

15   I did not receive any indication that they had not received

16   that.  Hoping that the Court did read the supplemental

17   sentencing memorandum that I sent over and filed after

18   receiving the psychological report of Steven Miller.  Your

19   Honor, did you receive that?

20         THE COURT:  Yes, I did and I reviewed it.

21         MS. BRAZILE:  Thank you, your Honor.  In the

22   sentencing memorandum, I highlight Dr. Miller's conclusions.

23   The Court asked for Dr. Miller to address two particular

24   questions and I do believe that Dr. Miller addressed those

25   questions pertaining to the maturity level of Mr. Walker,

```
1    particularly at the time of this offense where Mr. Walker was
2    between the ages of 18 and 20 years old.  Dr. Miller does find
3    that he had a cognitive impairment and he does indicate what
4    that conclusion is saying that Mr. Walker did suffer and does
5    suffer from a schizo type of defective disorder.  That disorder
6    Dr. Miller concludes -- I'm sorry, schizo type of personality
7    disorder, let me be corrected and that diagnosis also led Mr.
8    Or Dr. Miller to believe that Mr. Walker was impaired in terms
9    of his insight and in terms of his judgment.  What my
10   supplemental sentencing memorandum presented also to the Court
11   is that that conclusion is in line with the latest medical
12   research about the development of young brains and in
13   particular when a person is transitioning from teenage-hood to
14   adulthood, there's still brain development that's going on.  In
15   that particular sense, what I hope I was able to convey clearly
16   to the Court is that this particular brain development deals
17   with the impulses, aggression, emotions and instinctive
18   behavior.  That was very interesting that Dr. Miller's
19   conclusions along with this latest research that has been
20   recognized by the Supreme Court in those cases that I cited
21   talking about how young people who are still developing can act
22   impulsively, they can act aggressively, but what I hope I was
23   able to convey to the Court the Supreme Court saw in that
24   research that a young person who has acted inappropriately,
25   illegally and even dangerously does not stay in that state.
```

1    Because they are young people, they can be changed.  Dr. Miller

2    came to that conclusion for Mr. Walker as well and that is the

3    hope for Mr. Walker.

4         What he did to the victims is inexcusable and

5    Mr. Walker does not offer this as an excuse, but what rather

6    this Court has the very onerous task of deciding is exactly

7    what would be just punishment for Mr. Walker's actions without

8    throwing him away and that's what I asked the Court to consider

9    when I was here the first time.

10        Mr. Walker can be redeemed and rehabilitated to never

11   commit this conduct again.  Dr. Miller indicated into his

12   report that Mr. Walker is not a pedophile, but rather that

13   Mr. Walker identified with these young girls because he

14   identified his sexual immaturity with theirs and that is

15   exactly what the Court wanted to understand, his maturity level

16   because as we present these cases for sentencing, the courts

17   have now have -- they now have the leeway to take into

18   consideration the nature and circumstances of the offense and

19   the characteristics of the defendant.  That's very important

20   because every case is not the same, every defendant is not the

21   same.

22        What I put in the sentencing memorandum also was that

23   Mr. Walker is an outlier for typical child pornography

24   defendants.  As the Sentencing Commission found themselves,

25   most of those defendants that are charged with child

1    pornography and charged with child pornography with mandatory

2    minimums as Mr. Walker is, their average age is 42, 41, 42

3    years old.  Mr. Walker is obviously a very young defendant in

4    comparison.  He has just entered adulthood and what my concern

5    and what I believe the counsel for the government also saw and

6    talking with the agents also saw this that we want to have his

7    conduct addressed, yes, but we didn't want him to be molded by

8    mature offenders in prison and that was the juxtaposition.

9    He's young enough to be impressionable by them and they mold

10   his brain or we can offer the opportunity for him to receive a

11   sentence where he will receive treatment more immediately and

12   have that mold him rather than the influence and interaction in

13   the prison community.

14          I requested the Court's consideration of all of these

15   things and the consideration of a sentence closer to the

16   mandatory minimum of 60 months because that would operate to

17   have Mr. Walker enter that treatment when he gets to the BOP

18   rather than the general population to be influenced by them.

19          I want to relate to the Court an experience that I

20   had when I came to visit Mr. Walker at the Milan Detention

21   Center.  I was going there to visit two clients, Mr. Walker and

22   another client of mine, another gentleman and I saw Mr. Walker

23   first while my other client waited.  After I concluded my

24   interview and discussion with Mr. Walker, my other client came

25   in and I saw Mr. Walker greet him and he greet Mr. Walker.

1    When he came into the room, he said Ms. Brazile, is he your

2    client?  I said yes, he is.  He said Ms. Brazile, that kid, he

3    shouldn't be here, he's telling people about his case, he's

4    thinking everybody is his friend and I've told him he has to,

5    he has to keep what's going on with him close to the chest and

6    he just can't trust everybody.  He said Ms. Brazile, he said

7    we're looking out for him 'cause I don't think he really

8    understands and I was touched by that because that's exactly

9    what everybody thought when they met Mr. Walker, they thought

10   that same thing.

11        This is a difficult case, Judge Goldsmith.  What

12   happened here and what happened to these young victims, I would

13   never want to see happen to a young person.  I would also never

14   want to see this happen to this young person, Mr. Walker and

15   trying to balance that is very difficult, but your Honor, I am

16   convinced the right thing to do here, you punished Mr. Walker.

17   He's been in custody for 30 months.  He survived COVID-19 while

18   in custody.  What he has experienced as the first time ever

19   being in trouble with the law has been life-changing already.

20        What I ask the court is to fashion a sentence here

21   that will let Mr. Walker go into those treatment programs

22   sooner rather than later.  They don't give the treatment until

23   the person is closer to the end of their sentence so they cue

24   those that are eligible according to their release dates.  That

25   means that if he receives a sentence as high as the guidelines

1    suggest here, and they are advisory, the statutory mandatory

2    minimum and the statutory maximum is what truly applies, the

3    guidelines are advisory, but if we give a sentence closer to

4    that maximum, Mr. Walker will sit amongst those seasoned

5    offenders influencing him.

6           He's still developing, that's the thing.  It's hard

7    to see that sometimes, but if you had your own teenaged

8    experiences, you see that they, I'm telling you, they, they're

9    in a world of their own until they mature and they do mature

10   and that's what we are hoping for Mr. Walker, he will mature

11   and with the treatment that will be offered in the treatment,

12   sex offender treatment program and with the treatment that

13   would be continued after his release under supervised release,

14   we give him enough time to be able to receive that treatment,

15   mature as an individual, apply those skills that he's learning

16   and become a productive member of society.

17          Your Honor, there are other members of his family

18   that are here.  His mother, Nyla (phonetic) Jones, his step-dad

19   Mr. Jones and friends of his family.  If the Court would allow,

20   his mother and step-dad would like to address the Court.  Of

21   course that is the Court's discretion at all, but they are

22   available to speak.  I did give to the Court the support

23   letters that came from other friends and family of his and of

24   course your Honor, Mr. Walker would like to address the Court

25   as well.  Thank you, your Honor, for your time and attention.

1          THE COURT:  All right.  Thank you, Ms. Brazile.  The

2     defendant of course has a right to address the Court and will

3     be given that right.  Victims have a right to address the Court

4     as well.  Other people do not other than attorneys in a case.

5     People who are interested in presenting their views are allowed

6     to write letters, but the Court's practice has been to confine

7     the people who speak at a sentencing to those who are entitled

8     to speak under the law so no offense to Mr. Walker's family,

9     I'm simply applying the same rule I've applied to every

10    sentencing that I've, I've conducted.

11         All right.  Mr. Walker, is there anything you'd like

12    to tell me regarding sentencing?

13         THE DEFENDANT:  Yes, your Honor.  Your Honor, thank

14    you for your time today.  I want to start off by saying that

15    saying my sincerest apologies to any and every victim, to all

16    courts, communities and citizens wholeheartedly.  I wish to be

17    reunited with my family, friends and community.  From December

18    14th, 2018 until now, all I ever do is plan ahead and focus on

19    my future.  Proverbs 26:11 reads "As a dog returns to his

20    vomit, so does a fool his folly."  Your Honor, I refuse to be

21    that fool.  My oath to everyone is that I will not let them or

22    even myself down and that I will not ruin my life any further.

23         Every day is not only a blessing, but a lesson as

24    well.  Ask for forgiveness of my transgression, your Honor.

25    May your mercy be upon me.  Your Honor, I pray that you

1    understand how truly sorry I am.  Whatever is required of me to

2    prove my genuineness, I will do.  Five years of both prison

3    time and supervised release is more than enough time for me to

4    prove my worth, your Honor.

5         I am now very conscious to the law and able to

6    comprehend the serious magnitude of my actions.  I accept all

7    accountability, your Honor.  I am not exempt, your Honor, but

8    if you were to concede to my minimum, I promise that I will not

9    let your concession go in vain.  All of my loved ones need me

10   as I need them.  I am going to get my education, seek mental

11   health counseling and be the successful man that the Lord wants

12   me to be, your Honor.  You will never have to worry about me

13   standing before you again, I swear.  I'm sorry that I have to

14   stand before you today.  That is all, your Honor.  Forgive me,

15   please.

16         THE COURT:  All right, thank you.  Ms. Wu, anything

17   for the government?

18         MS. WU:  Yes.  Thank you, your Honor.  Your Honor, as

19   you noted at the beginning of this hearing, the sentencing was

20   begun in 2019.  It was adjourned at the defense's request and

21   to my understanding the request was so there could be a

22   psychological evaluation to address Mr. Walker's maturity.  I

23   did receive a copy of Dr. Steven Miller's report, umm, and, you

24   know, he addresses some things beyond that that I had not

25   anticipated with the request, but I do want to address with the

1   Court now because Dr. Miller as part of his report decided to

2   opine on the risk of recidivism here with Mr. Walker and

3   certainly in cases like this when we are dealing with child

4   victims, that is of extreme importance to the government.  It

5   is, umm, a large part of what we do is motivated by protecting

6   other girls from becoming victims of defendants like Mr. Walker

7   and Dr. Miller relies on this instrument, this tool known as

8   the Static 99R to opine that Mr. Walker has a low risk of

9   recidivism and I want to address that because I, umm, I

10  question the reliance on this tool here and I would like the

11  Court to keep in mind that there are limitations to it and

12  therefore limitations as to Dr. Miller's opinion based on it.

13  The Static 99R manual itself says quote "The Static 99R also

14  has a number of weaknesses.  On average it demonstrates only

15  moderate predictive accuracy."

16          Even though the tool itself in the manual says that

17  this is not really meant to be a strongly predictive tool and

18  that is what Dr. Miller chose to rely upon in coming to his

19  opinion that Mr. Walker has a low risk of recidivism and I

20  think the underestimation of the risk of recidivism is also

21  inherent in how this instrument functions as well because it

22  only considers as recidivists people who are convicted of

23  further sex crimes and I am sure your Honor well knows this is

24  an area where underreporting is rampant, where victims often

25  times stay silent for any number of reasons; fear, shame, a

1    desire to just move on with their lives and so a tool that's

2    based on only recidivism being counted as people who are later

3    convicted of recommitting these crimes is bound to undercount

4    the likelihood of recidivism.

5            I would submit to your Honor that this tool and this

6    report of Dr. Miller's is really not the best indicator we have

7    in this case of the risk of recidivism.  What we have that is I

8    think more informative is Mr. Walker's conduct on its own

9    because if your Honor may recall, when Mr. Walker's conduct was

10   discovered, he was not charged.  The FBI did execute a search

11   warrant, they did speak with him, they confronted him about his

12   conduct and they warned him to stop and left.  So Mr. Walker

13   was given a chance.  He was made aware of the consequences of

14   his actions and rather than respond to that what I would call

15   appropriately, he instead took advantage and continued to

16   victimize girls.  He persisted in contacting victims and

17   engaging in sexually-explicit conversations with them.  For

18   example, weeks after the FBI were at his home, he was in

19   contact with MV3.  She was 16 years old and the reports are

20   that he had saved pictures of her breasts despite apparently

21   telling her he wouldn't do that and seemed to be threatening to

22   expose her picture and this after he was there contact her most

23   recently within a few weeks after the FBI had confronted him.

24   So I would submit to the Court that Mr. Walker's already shown

25   that he can be told he's going to be facing serious

1    consequences for his actions if he doesn't stop, he can be

2    given a chance to show that he will and that's not a deterrent.

3    He's already shown once that he will take advantage of that and

4    keep going.

5         I don't want to belabor this hearing with just

6    discussing the issues with Dr. Miller's report, but, you know,

7    what I do want to note is that with all this language that I

8    think in some ways excuses the conduct here, Dr. Miller

9    actually doesn't suggest that there's a lack of competency or a

10   lack of understanding on Mr. Walker's part that what he did was

11   wrong and illegal.  In fact, Dr. Miller states and I quote,

12   "judgment relative to his offense behavior as being harmful to

13   those he has victimized, morally wrong and illegal was not

14   significantly impaired albeit somewhat blithely dismissed" and

15   when you, umm, when I at least got through the report that's

16   the type of stuff that stuck out to me.  You know, there's a

17   lot in here about what else may be going on, but at the end of

18   the day, even Dr. Miller, even the defendant's expert doesn't

19   think that there was a problem here or limitation that stopped

20   Mr. Walker from understanding that what he did was wrong, what

21   he did hurt people and it wasn't just wrong morally, it was

22   legally wrong and to move forth doing what he did in spite of

23   all that certainly raises concerns about future dangerousness.

24   You know, these are the types of anti-social characteristics

25   that makes us nervous about what would happen if he were

1    released quickly.

2           Dr. Miller's report raises a number of points along

3    these lines and just as a few examples, he for example states

4    that he believes Mr. Walker is at risk of psychosis.  He

5    comments that Mr. Walker doesn't respond with appropriate

6    empathy toward people, that he tends to hold resentment in and

7    then have occasional outbursts of projected hostility and this

8    hostility, this harmfulness, this kind of rage, you know, is

9    apparent when you look at the messages that Mr. Walker was

10   sending to children and I, I'd just like to take some time to

11   highlight some of these because I think it's important not to

12   talk sort of in summary form about what happened here, but to

13   look at what Mr. Walker actually said to his victims.  For

14   example, MV1, she was a 13-year-old girl.  At the time the

15   conversation I'm about to relate to your Honor took place,

16   Mr. Walker was 20 and just short of turning 21 and he was

17   speaking with her using the name Fighting Dreamer Devil which

18   was one of his online screen names that he used when he

19   communicated with his victims and again, that is a 13-year-old

20   girl and he tells her get back on and do it right or else I'll

21   send your nudes to the people from that chat you invited me in,

22   I have quite a few of them in PMs.  This victim, again

23   13-year-old MV1 responds okay, okay, hold on.  Mr. Walker tells

24   her I can ruin your life and have you killed, make a damn

25   choice.  Says to her later run from me again and that's what

1    your ass, do you fucking understand me?  And your Honor, I

2    apologize for the profanity.  I'm reading this as Mr. Walker

3    wrote it to his victims so that it is accurate.  And then after

4    that message, he sent an image that was not recovered by law

5    enforcement and then he says answer me, damn it.

6            There's some more conversation that continues and

7    then he tells her do those for me and I'll stop all of this, is

8    that understood?  If not, dot, dot, dot, then you know what

9    must happen.  The victim protests to him this is wrong to do

10   and he responds so you're asking to die.  She responds to him

11   I'm not asking to die, I was taught in my life not to do this,

12   I just can't.  So Mr. Walker tells her I'll expose you to them.

13   MV1 asks him isn't there another 13-year-old you can bother?

14   His response is then I'll send someone after your tracked

15   location.  She protests don't track me, please, this is dumb,

16   you're going to kill me because I won't send you pictures of my

17   body.  To that, Mr. Walker sent three images that were not

18   recovered and then followed that up with the message I wonder

19   what people will think of you once they see all of these and

20   again, that was a 13-year-old girl, MV1.

21            I also would like to present to the Court messages to

22   MV7 who was a 15-year-old girl and again your Honor, I

23   apologize for the profanity.  I'm just reading these messages

24   as they were written and Mr. Walker says to there girl, MV7, 15

25   years old, listen to me, I didn't send them, FFS, you dumb fat

1    bitch, listen before I have you killed and then, in all capital

2    letters, on God.  In all capital letters, listen to me and stop

3    running, you fat ugly bitch, even if you keep running, I can

4    still have you tracked through IP and I have what you look like

5    and your nudes so please stay and listen, this is your last

6    chance.  Would you stop blocking me like a hoe?  I can't

7    explain if you keep doing that, you have no right to be mad,

8    you couldn't complete one simple task.  That's a 15-year-old

9    girl.

10           These were real victims, real children that he put in

11   fear of his retaliation because they didn't want to send him

12   further naked pictures and, you know, I think -- I noticed when

13   I looked at Dr. Miller's report that in the list of materials

14   he said he reviewed, the discovery wasn't part of them.  He did

15   not contact our office to obtain the materials we were in

16   possession of for this case.  It's not clear to me if he saw

17   these messages or even a variant of them and I wonder what

18   impact that might have had on his conclusions had he actually

19   had the record of the case.

20           I'm not sure given what he listed as the materials he

21   reviewed in his report that he had a full picture of the

22   conduct here, umm, and that at least strikes me as possibly the

23   case with the letters that were submitted by the defense as

24   well.  I read them and what struck me is the number of people

25   who clearly love Mr. Walker who spoke so highly of him, who

1    talked about how the person they knew was not a predator, the

2    Mr. Walker they knew is a good person, you know, a happy

3    person, a person that brings so much to their lives and think

4    that that unfortunately is just not uncommon with this type of

5    criminal, especially the type of criminal that would prey on

6    children sexually online.  You know, the Internet's brought a

7    lot of good to this world, but it has also had some negative

8    consequences and one of those is how easy it is now for people

9    to prey on children on line while they leave the people around

10   them totally in the dark about what they're doing.  You know,

11   you can have somebody on a computer, on a phone ostensibly just

12   browsing the Internet doing something completely innocent when

13   really they're acting on these impulses that would horrify

14   people who love them if they knew.  Surely it would horrify

15   them, but nobody can see over their shoulder necessarily to see

16   what they're doing and that emboldens them.  There's this

17   anonymity and kind of physical remove that's facilitated with

18   online communication and there's an ease of access to victims,

19   too.  It can be so much easier to target and find victims that

20   they might -- that the predators may otherwise not have access

21   to if they were forced to seek victims in person and there's a

22   little bit of an ease of evading detection, too.  The victim

23   doesn't necessarily see you unless you exchange images or

24   something.  You can pretend to be somebody else, you can keep

25   yourself one step removed and hide who you are, make it harder

1   for you to actually have to face consequences for what you do

2   so these types of cases I think are particularly troubling and

3   I think particularly underreported, under-prosecuted, you know,

4   and so for these types of cases I would argue your Honor

5   deterrence is actually a particularly important factor

6   especially when you have a case like this one where despite the

7   charge offered being receipt of child pornography, the case is

8   actually about production of child pornography.  That's a very,

9   very serious offense and defense counsel is correct, there are

10  some mitigating circumstances that my office recognized in this

11  case specific to Mr. Walker, but that's why we offered him a

12  plea to receipt of child pornography.  This plea offer dropped

13  the applicable mandatory minimum from 15 years to five years

14  and the statutory maximum from 30 years to 20 years which

15  really, you know, cut the guidelines in this case down by 120

16  months or down from the low end of the guideline range.  It's

17  120 months below the low end of the applicable guideline range

18  here.  So what I would say to your Honor is that we took a lot

19  of what defense counsel raised in her arguments into account.

20  That was taken into account with the plea that was offered.

21  He's already been given substantial benefit because of it

22  despite the seriousness of the conduct here and the conduct

23  here is that over a span of about three years, through when

24  Mr. Walker was 21 years old, he preyed on children.  He

25  produced and received child pornography of multiple minor

1     women, minor girls.  He threatened them when they resisted his

2     requests for more images and there were dozens of videos and

3     images including ones involving penetration.

4          Just because these girls that were victimized were

5     victimized over the computer and not directly physically by him

6     doesn't mean the harm is not significant here.  When you look

7     at the statistics, there's a high incidence of self-harming

8     behavior and suicide in sextortion victims and I would like to

9     call your attention to the impact on one particular victim in

10    this case.  This victim is identified as MV5.  I spoke with her

11    guardian in advance of the original sentencing in this case and

12    I've been in touch since to see whether MV5 or her family

13    wanted to participate in person in these proceedings.  It's my

14    understanding that it was a very hard decision for them, but it

15    was too hard for MV5 to appear and address the Court, but her

16    mother did send a victim impact statement.  I sent this to the

17    attention of the Court electronically.  I'd like to read it to

18    your Honor and I'd also like the letter itself, to move that it

19    be admitted as part of this record and placed under seal.

20         THE COURT:  All right.  Any objection to placing it

21    under seal, Ms. Brazile?

22         MS. BRAZILE:  No, your Honor.

23         THE COURT:  All right.  We'll grant that.

24         MS. WU:  Thank you, your Honor and your Honor, I'm

25    going to be substituting MV5 for the name of the victim here

1    although the original letter itself was written with her name.

2         THE COURT:  So what do you propose to put under seal,

3    the letter with her real name in it or the MV5 redaction?

4         MS. WU:  Umm --

5         MS. BRAZILE:  Your Honor, it was my presupposed

6    notion that it would be the one without the redactions that

7    would be under seal as it doesn't make any sense to make it

8    under seal if it's redacted.  I'm sorry, your Honor.

9         THE COURT:  Ms. Wu?

10        MS. WU:  Your Honor, I apologize.  I, umm, the --

11   since I'm planning to read this into the record, I agree with

12   Ms. Brazile.  The exhibit that was sent over with the

13   redactions would not need to be under seal.

14        THE COURT:  Okay.  Go ahead.

15        MS. WU:  Thank your Honor and the letter reads dear

16   Judge, MV5 was a curious, confident, chatty and active child.

17   She would openly engage in conversation with almost anyone.

18   She never cried unless she was in physical pain.

19        MV5 was horrified by the threats of death to her and

20   to us, her family, in 2018.  As a young girl of 14 at the time,

21   Devin Walker spoke with MV5 online and made her believe that he

22   was present in our neighborhood outside our home.  He made her

23   believe he would kill her if she did not comply with his

24   demands for sexual photographs.  I had never seen her cry and

25   wail in fear and remorse.  MV5 was physically and emotionally

1    shaken to her core.

2         The impact of Devin Walker's behaviors has been

3    ongoing both for MV5 individually as well as for our family as

4    a whole.  Since the shameful and terrifying experience, the

5    following has changed and is currently true for MV5.  Cannot

6    sleep without the lights on.  Lonely and rejected by her peers.

7    Has become friendless.  Struggling with academics and failing

8    multiple courses.  Has required counseling for the first time.

9    Struggled to hold a part-time job and was quickly let go.

10   Experiences suicidal thoughts.  She experiences social

11   isolation.  Anger is frequent.  Depression is constant.  Low

12   self-esteem.  For me and my family, this is painful.  We have

13   worked at providing her a loving and stable home, but her

14   mental health has deteriorated in ways that we cannot control

15   or counteract.

16        Devin Jamal Walker has done irreparable damage to my

17   daughter and my family.  I do not wish this experience for any

18   other child or family.  Please do your best to ensure that

19   others are protected from him.  Sincerely, MV5's mother.

20        Now your Honor, I do want to note for the record that

21   I spoke with MV5's mother and I assured her I'd bring this

22   letter to your attention.  I've reached out to other victims'

23   guardians as well and, you know, I hear back from them how hard

24   this is and frankly how sometimes hearing from me is unwelcome

25   to them because they don't want to be reminded of the pain that

1    this has gone through.  We've even had one contact my office

2    back and asked to not be contacted again, not because what

3    happened wasn't serious, but because the victim just didn't

4    want to be trying to recover her life and have letters and

5    notifications and calls popping up reminding her about how she

6    was victimized by Mr. Walker.  This conduct is so serious and

7    it causes so much harm and it can't be excused by, you know,

8    being bullied or abused as a child, being immature, insecure,

9    relating better to other people.  Those aren't things that turn

10   someone into a predator on children and, you know, one more

11   thing about Dr. Miller's report is that, you know, there's a

12   line in here that kind of really stuck out to me when I think

13   about this harm that was suffered by these girls, when I think

14   about the messages that Mr. Walker wrote to them and it's where

15   Dr. Miller says, you know, Dr. Miller rejects the notion I

16   suppose that this behavior was motivated by a sexual interest

17   in young girls.  I don't know that I agree with that given that

18   this behavior was seeking sexual images from young girls and

19   trying to sextort them into providing more.  Regardless though,

20   what Dr. Miller says that in his opinion, Mr. Walker's primary

21   motivation was driven by the apparent increase in his

22   self-esteem that he derived from having emotional control over

23   them and, you know, assuming that that is true, that to me is

24   even more alarming that if you take the sexual aspect out of

25   it, what is motivating Mr. Walker in the way that he went after

1    these young girls is that he wanted to have power and control

2    over them.  I think that adds an extra element of concern to

3    the conduct here.

4           As your Honor noted, the guideline range in this case

5    would be 360 months to life, but because of the statutory

6    maximum, again of the charge that we allowed Mr. Walker to

7    plead down to in recognition of some of the mitigating factors

8    in this case, the guideline range becomes a single number of

9    240 months.  I would submit that there's nothing in the record

10   that suggests the guidelines and the calculations that go into

11   them aren't applicable here.

12          I think that what the defense has proposed, a

13   sentence of five years, is insufficient.  I understand what the

14   defense has argued about the timing of treatment relative to

15   when a sentence is supposed to terminate, but that's not all

16   that matters when you're doing sentencing.  You know, when you

17   look at the 3553(a) factors, I would submit that a much longer

18   custodial sentence is necessary to reflect the seriousness of

19   the offense, to protect the public and to provide adequate

20   deterrence.  Thank you, your Honor.

21          MS. BRAZILE:  Your Honor, if I may?  I would like to

22   correct something about the government's presentation that I

23   think is pretty important.

24          THE COURT:  All right, go ahead.

25          MS. BRAZILE:  Your Honor, Dr. Miller is not the

1    defense counsel's expert.  At the initial sentencing hearing,

2    this Court asked if there had been a psychological evaluation

3    done.  Neither party presented that and the Court wanted the

4    additional information of a psychological report.  This Court

5    asked the probation department to find an expert that would

6    chime in on these questions that the Court had about any

7    predatory nature of Mr. Walker or any mental disease of

8    Mr. Walker and it was the probation department that contacted

9    and contracted with Dr. Steven Miller.  The defense did not

10   hire him.

11        This was a neutral report that this doctor who

12   examined Mr. Walker at behest of the Court presented.  So he is

13   not slanting his report in any manner.  In fact, the Static 99

14   is the industry standard that's used in these cases.  I had

15   nothing to do with that and he had nothing to do with that,

16   that's simply the industry standard.  I think that that's

17   important to understand.  Dr. Miller did exactly what this

18   Court asked him to do and I believe that his conclusions are in

19   line with industry practice and should be considered by the

20   Court as valid.  I believe that was very important for that to

21   be brought out.

22        MS. WU:  Your Honor, if I may?  I apologize.  It was,

23   umm, it's been awhile and it appeared my memory of how this

24   report came to be was incorrect and I did not mean to mislead

25   the Court on that.  I -- it was my memory at least that it was

1     the defense that pushed for a psychological evaluation, but

2     upon hearing Ms. Brazile speak, I do believe that this was

3     facilitated through probation as she said so I apologize for

4     anything I've said that was incorrect.

5            I do want to note for the record though that it's my

6     understanding that there are certain tests that are actually

7     the industry standard for psychosexual evaluations that were

8     not actually done here.  That's the hair and the PCLR.  The

9     Static 99R as I've already said and I won't belabor the point

10    has self-acknowledged limitations in this area.

11           MS. BRAZILE:  That being that one point, your Honor.

12    The other point is that from my understanding because he was

13    contracted by probation, the information that probation had

14    which would have included the information they received from

15    the government as discovery in this case would have been the

16    discovery in this case that was conveyed to Dr. Miller.  The

17    only thing I believe that Dr. Miller did not see were the

18    actual photographs and videos, that he did not see, but he did

19    receive the discovery materials that had the context of what

20    was said to the victims and those reports of the victims that

21    the government had.  Those were conveyed to Dr. Miller.

22           MS. WU:  Your Honor, if I just may on that point?

23    All I have to go on is what Dr. Miller actually lists as what

24    he reviewed and he says what he considered and reviewed were

25    the interview with Mr. Walker, a handwritten background

1    questionnaire and the PSR itself.  It doesn't say anything

2    about the discovery and I know at least that our office was

3    never contacted to provide the materials relevant to this case.

4         (Pause)

5         THE COURT:  The Court must follow the requirements of

6    the sentencing statute, Title 18 United States Code, Section

7    3553.  That statute requires the Court to impose a sentence

8    that is sufficient, but not greater than necessary to achieve

9    the sentencing goals that the statute sets out.  Those goals

10   include protecting the public from further crimes of the

11   defendant, affording adequate deterrence to criminal conduct,

12   providing defendant with needed educational or vocational

13   training, medical care or other correctional treatment in the

14   most effective manner; avoiding sentence disparities that are

15   unwarranted among defendants with similar records who have been

16   found guilty of similar conduct.

17        In addition, a sentence should reflect the

18   seriousness of the offense, promote respect for the law,

19   provide just punishment for the offense.  The Court has to take

20   into account all appropriate factors including the nature and

21   circumstances of the offense, the history and characteristics

22   of the defendant, the kinds of sentences available, sentencing

23   guidelines and the need to provide restitution where that is

24   required.  So the Court does take into account all appropriate

25   factors in fashioning a sentence that it believes will be

1    sufficient and not greater than necessary to achieve the

2    statute's sentencing goals.

3            In terms of the seriousness of the offense, there's

4    no debate that this is a most serious crime.  It's a crime

5    committed against some of the most vulnerable people in our

6    society, children.  Children by definition are not equipped to

7    protect themselves against those who abuse them and prey upon

8    them.  It's for that reason that the law fixes penalties or

9    allows penalties with such severity as exists in this case.

10   It's for that reason that there's a statutory minimum for this

11   offense and for that reason there's a significant upper end to

12   punishment.

13           The particular circumstances of the case are also

14   deeply troubling.  The case involved producing and receiving

15   pornography.  It involved children, specifically six minor

16   females and essentially terrorizing them by threatening to

17   reveal revealing pictures to the world at large.  The chilling

18   threat is quoted in the presentence investigation report, quote

19   "I can ruin your life and have you killed, make a damn choice."

20   What a young girl of a tender age would feel having received

21   that kind of fearsome message is hard to imagine fully.

22           We do know that the victims have been impacted,

23   perhaps permanently in severe ways.  We've received the letter

24   from the mother of MV5 who details essentially the total

25   deterioration of her daughter's life, a daughter who was once a

1   confident and active child has had her life entirely degraded.

2   Unable to sleep, feeling lonely and rejected, becoming

3   friendless, struggling with school, requiring counseling,

4   difficulty with work experiences, frequently angered and

5   depressed.  The human damage here is incalculable.

6        What is also part of the consideration by the Court

7   is the defendant's unwillingness or reluctance to recognize

8   even after the FBI had entered the picture to stop doing what

9   ultimately brings him to court this afternoon.  He continued

10  the victimization even after the entry of the FBI into his

11  awareness.  He understood that the authorities were looking

12  into what he had done and yet he continued.  That is just hard

13  to fathom.

14       Every defendant who appears before the Court is an

15  individual who has a collection of impulses; some good, some

16  bad.  Mr. Walker has some good impulses.  The Court has read

17  the letters that were submitted.  He's viewed by his family as

18  a good-natured person, helpful, cooperative.  He's become more

19  spiritual, engaged in religious activity.  All those dimensions

20  are certainly part of what the Court has to consider in

21  fashioning a sentence.

22       The Court takes into account Mr. Walker's relatively

23  young age when he engaged in this activity.  The Court is aware

24  of the Supreme Court's recognition regarding brain development

25  of younger persons.  That of course does not excuse the

1   criminal conduct, but it's a factor that a Court can consider

2   in determining what is the appropriate judicial response to

3   even despicable behavior and this is despicable behavior.

4        Much has been said about Dr. Miller's report so I do

5   want to refresh everyone's recollection.  Back on September 5

6   of 2019 when we gathered for sentencing, defense counsel made

7   the point that this defendant really has the immaturity of a

8   15-year-old.  It was that comment that prompted this Court to

9   order a psychological evaluation to see if there was something

10  that would be learned that would be of value to the Court in

11  fashioning a sentence.  Both sides agreed that was an

12  appropriate course of conduct and therefore the Court did order

13  an evaluation and Dr. Miller's report was received and reviewed

14  and the Court is grateful to Dr. Miller for his hard work in

15  assessing Mr. Walker.

16       Predictions about recidivism are always fraught.

17  Human beings are by nature essentially unpredictable though we

18  try to develop psychological tools to do the best that we can

19  in what is an imperfect science.  The Court does not fault Dr.

20  Miller for making an assessment on that issue of recidivism and

21  coming to the conclusion that Mr. Walker is a low risk for

22  re-offending, but predicting how Mr. Walker is going to behave

23  in the future especially when his future will be a custodial

24  one for a significant period of time is a very difficult

25  prediction to make.

1          The more pertinent finding from Dr. Miller is that

2     Mr. Walker did recognize the wrongfulness of his conduct, but

3     lacked sufficient empathy to act on that recognition.  That is

4     often the chief difference between those who obey the law and

5     those who disobey the law especially when it comes to actual

6     human victims.  It may well be as Dr. Miller theorized that

7     Mr. Walker was motivated by some impulse to exercise power and

8     control over victims.  The Court doesn't feel that that theory

9     really assists the Court in fashioning an appropriate sentence.

10    Certainly doesn't make it more likely in the future that

11    Mr. Walker is going to resist re-offending simply because the

12    impulse had to do with control over others.  That may be an

13    impulse he doesn't learn to control in himself.

14          The defense points out a number of points that the

15    Court does take into account.  This is Mr. Walker's first

16    offense.  The Court recognizes he's going to be living among

17    more seasoned offenders, but of course that's going to be true

18    no matter how long the sentence is.  He's going to be in

19    custody for a significant period of time whether the Court

20    adopts the defense view of a sentence toward the statutory

21    minimum or the government's view of a sentence toward the

22    statutory maximum.

23          The defense points out that Mr. Walker can change.

24    That certainly is the Court's hope, but change can't be

25    predicated on the statements of a defendant at sentencing

1    without some significant facts that would support the view that

2    a defendant truly is recognizing the grave mistakes that he's

3    made.  In any case, the Court does take into account his

4    expression of remorse.  The Court believes that's going to be a

5    start for him to get on the right side of the law, but that's

6    not going to be enough to direct this Court's view of how to

7    weigh that with the greater weight as the defense would urge

8    versus a much lesser weight as the government would urge.

9          This is a difficult case because it's a sentencing

10   involving victimized children by a younger individual who is

11   not all that far past childhood, but he was an adult and he

12   understood what he was doing and he continued to do it after he

13   knew authorities were involved and watching and what he did was

14   dastardly.

15         The Court's sentence has to protect the public from

16   further crimes of the defendant, it has to deter others who

17   would imitate his conduct, it has to vindicate the law that has

18   been violated and ultimately the sentence has to constitute

19   just punishment for what the defendant has done.  A sentence at

20   or near the statutory minimum as the defense argues would not

21   come close to meeting any of those goals.  At the same time the

22   Court believes that a sentence at the statutory maximum as the

23   government is urging would be excessive.

24         The Court does believe that a variance is required in

25   this case because of the age of the defendant, because of his

1    crime-free record and because the ultimate command of the

2    statute is to fashion a sentence that is sufficient, but not

3    greater than necessary.  The Court does believe that a sentence

4    of 15 years will be sufficient and not greater than necessary

5    to accomplish the statute's goals.

6            Therefore, pursuant to the Sentencing Reform Act of

7    1984, having considered the sentencing guidelines which are

8    advisory and not mandatory, having determined that a variance

9    from them is appropriate for the reasons stated on the record,

10   having taken into account all of the factors contained in Title

11   18 United States Code, Section 3553, the Court sentences the

12   defendant to the custody of the United States Bureau of Prisons

13   for a term of 180 months.

14           Upon release from imprisonment he'll be placed on

15   supervised release for a term of five years.  It's further

16   ordered that defendant pay the mandatory special assessment of

17   100 dollars due immediately and the 5,000 dollar assessment

18   under the Justice For Victims of Trafficking Act.  The Court

19   waives the imposition of a fine, cost of incarceration, cost of

20   supervision due to the defendant's lack of financial resources.

21           Mandatory drug testing is suspended.  Defendant must

22   cooperate with collection of a DNA sample as directed by

23   probation.  While on supervision, he must abide by the standard

24   conditions as adopted by our Court including the following

25   special conditions:  He must submit his person, property,

1    house, residence, vehicle, papers, computers, all other

2    electronic devices and media to a search by a United States

3    probation officer.  Failure to submit to a search may be

4    grounds for revocation of release.  He must warn all occupants

5    of premises that he shares or that he occupies of this

6    condition.

7         Probation may conduct a search under this condition

8    only when reasonable suspicion exists that defendant has

9    violated a condition of supervision and that the areas to be

10   searched contain evidence of the violation.  Any search must be

11   conducted at a reasonable time and in a reasonable manner.

12        Defendant shall not purchase, sell, view or possess

13   images in any form of media or live venue that depict

14   pornography, sexually-explicit conduct, child erotica or child

15   nudity.  He shall not patronize any place where search material

16   or entertainment is available.

17        He may not associate with minor children under the

18   age of 18 except in the presence of a responsible adult who is

19   aware of his conviction for this offense unless he has the

20   prior approval of probation.  He may have unsupervised conduct

21   with any of his own children at the discretion of probation.

22   He may not frequent places where children congregate on a

23   regular basis such as school grounds, playgrounds, child toy

24   stores, video arcades.

25        He must notify anyone that he dates or marries who

1    has a minor child under the age of 18 of this conviction.  His

2    employment will be pre-approved by probation.  He shall not be

3    employed or participate in any volunteer activities that

4    involve contact with minors under the age of 18, with

5    disabilities without prior approval of probation.  He must

6    submit to a psychological psychiatric evaluation as directed by

7    probation if necessary.

8            He must comply with the requirements of the Sex

9    Offender Registration and Notification Act as directed by

10   probation, the Bureau of Prisons or any other state sex

11   offender registration agency to which he is subject.  He must

12   successfully complete any sex offender diagnostic evaluations,

13   treatment or counseling programs as directed by probation.

14   Reports pertaining to such assessments and treatment shall be

15   provided to probation.  Based on his ability to pay, he shall

16   pay the cost of such evaluations, treatment or counseling

17   programs as determined by probation.

18           He shall participate in the computer Internet

19   monitoring program administered by probation, must abide by

20   those program rules including any amendments to the program

21   rules.  He must submit all of his computers, hardware, software

22   and accessories to search by probation at a reasonable time and

23   manner.

24           The Court is of the view that no victims have applied

25   for restitution, but if they do within a reasonable period,

1     then the Court will award restitution as appropriate under the

2     law.  Is there any objection to the sentence from the

3     government?

4          MS. WU:  Not to the sentence, your Honor.  If I may

5     address the restitution issue?

6          THE COURT:  Yes, but first let me find out if Ms.

7     Brazile has any objections to the sentence?

8          MS. BRAZILE:  Yes, your Honor if you bear with me,

9     I'll put my objection on the record.  Your Honor, Mr. Walker

10    believes that the sentence that the Court has imposed is, is

11    definitely greater than necessary and excessive in this case

12    and based on primarily two inaccurate assessments of the facts

13    of the case and I have to bring that to the Court's attention.

14         This, the parties in this particular case, previous

15    government counsel and myself, we talked extensively about this

16    and it resulted in the Rule 11 Plea Agreement that we have.

17    The mandatory minimum of 15 years for production was exactly

18    what the parties were intending that your Honor would be able

19    to avoid.  It was not the mandatory minimums as the government

20    has alleged here today, it was the -- I'm sorry, mandatory

21    maximums, but the mandatory minimums that we were concerned

22    about and that's why we constructed and it was offered that

23    that mandatory minimum be lowered to give the Court the range

24    that we felt was a lot more appropriate here because of the

25    immaturity of this defendant.

1            I want to make it clear to the Court and we did not

2    want to convey any lack of responsibility.  That is not what we

3    wanted to convey, but the facts of the case, the, the Court has

4    relied on what the government has asserted was his continued

5    conduct after the FBI came to his house.  That is not accurate,

6    your Honor.  The discovery in fact showed that Mr. Walker was

7    told by the FBI to discontinue his conduct and that they

8    discovered that the minor victim had communication with the

9    defendant again.  That communication was not threats, that

10   communication was not solicitation of any new conduct.  What

11   they -- what was ascertained was about conduct that occurred

12   before the FBI came to his house.  That is the new and

13   different conduct, not after the FBI came to his house.

14           Minor victim number five, your Honor, was not

15   included in our Rule 11 for this reason, the government did not

16   ascertain in any of the materials pertaining to Mr. Walker any

17   threats to that victim.  There were no threats or solicitations

18   to that victim.  That victim was contacted because there was a

19   conversation with that victim, but they did not glean from

20   Mr. Walker's information that there had been any of those

21   threats.  She was not a part of our Rule 11.  Those things are

22   important, your Honor, and I do implore the Court to consider

23   that.  If you need additional information about that, I believe

24   it is important enough that the Court receive that additional

25   information and take into consideration that the intention of

1   the parties was that a sentence of 15 years would have been

2   excessive here and that's why they negotiated that reduction in

3   the mandatory minimum, to give the range between five and 15 or

4   five and 20 which would have been the statutory minimum and

5   maximum.  I implore the Court to consider that and reconsider

6   the sentence in this case your Honor because we can achieve

7   those goals with something less than that minimum we wanted to

8   avoid.  Thank you, your Honor.

9          THE COURT:  All right.  Ms. Wu, you want to respond

10  to that?

11         MS. WU:  Umm, yes if I can briefly, your Honor?  I'm

12  not sure, umm, obviously Ms. Brazile seems to be referring to

13  conversations that I was not privy to between her and Ms. Russo

14  who was the, umm, who previously was also on this case until

15  she transferred to a different U.S. attorney's office, but for

16  purposes of the record, I can confirm with your Honor that Ms.

17  Russo was on this case up until she left our office including

18  at the time that the government attorneys, me and Ms. Russo,

19  submitted the government's sentencing memorandum and the

20  recommendations.  It's not at least my belief that I have

21  misrepresented anything regarding our offices as a whole

22  including Ms. Russo's understanding of this case.  I'm not sure

23  if Ms. Brazile may have misheard me, but it was my

24  understanding correct and I believe I did say this that the

25  reason that Mr. Walker was offered the plea deal that he was

 1   given was for both reasons, it lowered the mandatory minimum

 2   substantially and it lowered the statutory maximum

 3   substantially and we did feel that that was appropriate.  My

 4   point in raising those issues was just to note for the Court

 5   that we did take into account some of the mitigating

 6   circumstances here and we believe that our position, our plea

 7   offer and our presentation to the Court is consistent with

 8   that.

 9          As as far as MV5 is concerned, it's not entirely

10   clear to me if the, umm, the position that Ms. Brazile stated

11   was to deny that she's a victim, but for the record, this is a

12   mess -- these are messages that Mr. Walker sent to MV5, this is

13   the victim whose mother's victim impact statement I read to the

14   Court.  He says to her you must really be scared of me, no

15   matter how much you run or where ever you run, I still have

16   your nudes and face.

17          So it's certainly our position that we, umm, that

18   there was no inappropriateness to us bringing her mother's

19   letter to your Honor's attention and I'm happy to address more

20   information about that if you would like.

21          Oh and your Honor, I apologize, one more thing.  As

22   far as the conduct after the FBI confronted Mr. Walker's

23   concerned, I believe that information is in the Rule 11.  I did

24   not mean to suggest anything that was contradictory to that,

25   but in the Rule 11 Plea Agreement, Mr. Walker agreed, quote,

1    even after the FBI collected electronic devices used by Walker

2    to produce and receive child pornography and warned him to

3    discontinue his actions, he continued to reach out to victims

4    and engage in sexually-explicit conversations with them.

5            The victim that I spoke about was one that he, among

6    the ones that he appears to have continued to engage in

7    conversations with and among the course of his conduct with her

8    which spanned from before the time that the FBI spoke to him

9    and after when he continued the conduct with her was when he

10   had saved pictures of her breasts and the conversation was had

11   where she expressed dismay when he showed her that he had saved

12   them.

13           MS. BRAZILE:  I'm sorry, Ms. Wu, what are you

14   referring to in the Rule 11?  What is that page?

15           MS. WU:  Page three, last sentence of the top

16   paragraph.

17           MS. BRAZILE:  Page three, last sentence of the what

18   paragraph?

19           MS. WU:  Top.

20           THE COURT:  All right.  Let me focus on that because

21   that's the language that's picked up in the presentence

22   investigation report in paragraph 18 and there was no objection

23   to that language when I asked if there were any corrections to

24   be made to the report and I didn't hear Ms. Brazile object to

25   anything that Ms. Wu said regarding the actions that Mr. Walker

```
1    took after the FBI had given its warning to him.
2              So let's be very clear at this point on the record.
3    I want to know exactly what it is the government is saying
4    Mr. Walker did following the warning from the FBI to stop his
5    actions and do you have any documentation for that that I can
6    look at?
7              MS. WU:  Umm, your Honor, I apologize.  I don't have
8    on me any of that documentation.  I -- given that this sentence
9    was in the Rule 11 and in the PSR not objected to, I did not
10   anticipate that being a debated issue for purposes of this
11   proceeding.  To be absolutely clear on the record, the conduct
12   that I am asserting Mr. Walker committed after the FBI
13   confronted him is exactly what's stated here.  He continued to
14   reach out to victims and engage in sexually-explicit
15   conversations with them including a victim that he had
16   sextorted.
17             THE COURT:  And which victim is that?
18             MS. WU:  MV3, your Honor.
19             THE COURT:  All right and are you able to tell me now
20   what exactly he did with MV3 after the FBI warning?
21             MS. WU:  Umm, your Honor, I, umm, I'm not sure of the
22   timing of it.  At one point he did send her a picture of a
23   minor female with exposed breasts that prompted her to respond
24   thought you didn't save any of them, you even said you don't
25   save those.  When she was forensically interviewed in November
```

1   of 2018 which was after the FBI confronted Mr. Walker, she said

2   that she'd last been in contact with him the day before they

3   interviewed her which was November 13th, 2018.  I do not know

4   if the nature of those conversations was only sexually explicit

5   or if it was sexually explicit with a threatening tone, but she

6   did state that she felt threatened by him during their

7   conversations.  I don't have the exact timing on that, your

8   Honor.

9           THE COURT:  All right.  Do you have documentation in

10  your office that would establish more clearly what Mr. Walker

11  said or did and when he did it?

12          MS. WU:  I'm happy to look into that, your Honor,

13  yes.

14          THE COURT:  All right.  Now Ms. Brazile, I'm not sure

15  I understand the other point you're making.  There was some

16  kind of plea agreement that dropped one charge and by doing

17  that, it lowered the statutory minimum as well as the statutory

18  maximum.  That, I understood.  I'm not sure what you're saying

19  is the mistake I made regarding that.

20          MS. BRAZILE:  Your Honor, what I'm saying is that the

21  intention of the parties in drafting the Rule 11 was to avoid

22  the mandatory minimum of 15 years and give the Court the option

23  and the, umm, with the defendant's understanding that he would

24  be asking for a sentence that was significantly below the

25  15-year mandatory minimum that he would have faced had the

1    charge remained a production charge.  Those negotiations were

2    taking into consideration everything that I've presented to the

3    Court today about the defendant's immaturity and again, the

4    intention was not to avoid or to say there was a lack of

5    responsibility.  Yes, there is and Mr. Walker has said to the

6    Court that he accepts responsibility and accountability for

7    that, but what we were looking at and what the Court saw as

8    well when he ordered the psychological report was that this

9    defendant was of a particular immaturity and because of that

10   that drove a lot of the actions here, the impulsiveness that is

11   talked about, the aggressive behavior.  That is what Dr. Miller

12   even indicated was part of his psychological issue which he

13   identifies in the report so that's giving the context what have

14   happened here and that those things would impress upon the

15   Court that the 15-year minimum that he would have been facing

16   would have been excessive here and that below that minimum was

17   what the parties or the spirit of the negotiation of the

18   parties was about and that's why that charge was offered, your

19   Honor.

20        Mr. Walker objects to the sentence as excessive.  It,

21   it does contradict the intention and the spirit of the parties

22   in negotiation and why this Rule 11 was offered and yes, I want

23   to address that yes that's the language in the Rule 11 and yes,

24   that was picked up by the probation department and this was a

25   negotiated plea, your Honor.  We negotiated that and accepted

1    the fact basis and presented that to the Court, but it, it begs

2    that the Court receive and have as accurate a picture of the

3    conduct that Mr. Walker engaged in and what I'm presenting to

4    the Court in my objection is that to rely on that, the two

5    factors that are of questionable accuracy, it does not, umm,

6    that should not be the basis, the full basis of the Court's

7    sentence and I ask the Court to please receive that additional

8    information that you've asked for, to please consider those

9    factors and reconsider the sentence imposition that the Court

10   has pronounced.

11        THE COURT:  Well, I'm trying to figure out the

12   objection you're raising regarding the intent of the parties.

13   That's not an objection I understand.

14        MS. BRAZILE:  Okay.  I --

15        THE COURT:  So I'm trying to see if there's some

16   legal objection you're attaching to that.  I don't know what

17   the parties intended and it doesn't really become relevant

18   other than what's actually in the Rule 11 agreement.  Why the

19   parties did something is only discernible by looking at the

20   language of the Rule 11 agreement and I know you're not saying

21   that my sentence violates the Rule 11 agreement so I'm trying

22   to understand what your argument is about this history of how

23   the charge changed to one that allowed for a lower statutory

24   minimum and a lower statutory maximum.

25        Perhaps the defense hoped that the Court would impose

1    a lower sentence given that there were lower parameters to it,

2    but I'm trying to understand if you have an argument aside from

3    your argument that the sentence is excessive, I understand

4    that, but I'm not -- now I'm trying to understand why you're

5    talking about what the parties intended.

6              MS. BRAZILE:  I offered that background because it

7    gives the context to the objection that the sentence of 15

8    years is unreasonable and excessive here because and that

9    context of the background of our negotiations.  We specifically

10   were negotiating, going back and forth about eliminating that

11   mandatory minimum and to impose that mandatory minimum would

12   have been excessive and unreasonable, and that's my objection,

13   your Honor.  It's the clearest I can make it and I appreciate

14   your time in listening and considering what I'm saying, your

15   Honor.

16             THE COURT:  All right.  I want to talk about MV5 a

17   little bit.  Ms. Wu, what exactly is her connection or was her

18   connection to this case?  She's not referenced in the Rule 11

19   agreement, correct?

20             MS. WU:  Umm, not, umm -- well, not separately, your

21   Honor, but the Rule 11 agreement just further describes three

22   victims; MV1, two and four as illustrative examples.  It wasn't

23   meant to assert that only the three that were specifically

24   called out were victims in this case.  MV5 to my understanding

25   was found because of the conversations that Mr. Walker was

1    having on line including the one that I read to your Honor

2    where he tells her no matter how much you run or where ever you

3    run, I still have your nudes and face.  It is that, umm, those

4    threats that at least indicate to us that she's a victim of his

5    conduct and certainly the information that we received from her

6    mother's statement as well and your Honor, I'm sorry, does that

7    answer your question about MV5?  There was another --

8              THE COURT:  Well, it's answers my question regarding

9    the Rule 11, she's not referenced, but she is referenced in the

10   presentence investigation report in paragraph nine.

11             So now I'm going turn to you, Ms. Brazile.  I'm not

12   sure what your objection is regarding MV5.  She was referenced

13   in paragraph nine as a victim and she was talked about

14   obviously during the government's argument here in sentencing.

15   You didn't object to that when she was talking about it so I'm

16   not clear.  What is it you're objecting to now regarding MV5?

17             MS. BRAZILE:  Your Honor, Mr. Walker insists that he

18   did -- he is not the one that communicated with her.  What the

19   government has recited as his communications, Mr. Walker is

20   saying he did not have those communications with MV5.  There --

21             THE COURT:  He's saying now she was not one of his

22   victims?

23             MS. BRAZILE:  No, that's not -- what we're

24   clarifying, there was a conversation, okay?  The information

25   that the government has came from MV5's materials or her phone.

1    They were not found in Mr. Walker's materials or phone and

2    Mr. Walker has represented to me that he did not present that

3    information that the government is referring to to MV5.  There

4    was no -- so it lists her, it says that she was a victim and

5    that's in reference to any conduct or conversation, but what

6    the government is alleging was not found in Mr. Walker's

7    materials and that's why she was not included in our Rule 11.

8              THE COURT:  But you agreed, you agreed to paragraph

9    nine or you didn't to be paragraph nine in the presentence

10   investigation report --

11             MS. BRAZILE:  Paragraph --

12             THE COURT:  -- which refers to minor victim 5.

13             MS. BRAZILE:  Yes, it just refers to minor victim 5

14   who was 14 and that was -- it listed her, but it didn't list

15   conduct pertaining to Mr. Walker soliciting or threatening her

16   or anything.  This that the government is presenting today

17   about MV5 was presented at the original sentencing hearing,

18   this victim letter back in 2019 and this information would be

19   dated today, is completely understandable why we don't have any

20   current information, but again Mr. Walker in reviewing these

21   matters again insists that he did not have the alleged conduct

22   that the government has presented to the Court with MV5, not

23   that conduct or not that conversation.  That's not him.

24             Your Honor, I'm just asking Mr. Walker if he's

25   affirming that to me now and he would like to indicate to the

```
 1    Court exactly what he's saying.

 2              THE DEFENDANT:  Your Honor --

 3              THE COURT:  No, hold on.

 4              (Pause)

 5              THE COURT:  All right.  Ms. Wu, do you want to

 6    respond at all to what Ms. Brazile has said?

 7              MS. WU:  Your Honor, I'm not entirely sure how to

 8    respond as this is my first time hearing that they are

 9    challenging the status of MV5 as a victim.  I read the messages

10    that were in our records showing that he did attempted to

11    sextort her.  She's for our records and purposes been a victim

12    in this case so I'm not entirely sure where this dispute is

13    coming from.

14              THE COURT:  All right.  Well, here's what I'm going

15    to do.

16              MS. WU:  Your Honor, if I may though, there was one

17    thing that I wanted to read.  Is it -- okay.

18              (Pause)

19              THE COURT:  All right.  Go ahead, Ms. Wu.

20              MS. WU:  Your Honor asked if I had information

21    regarding conduct that Mr. Walker engaged in after he was

22    confronted by the FBI and I apologize for not remembering this

23    earlier, but on page six of Dr. Miller's report in the middle

24    of the page, there's information that at least according to the

25    report was relayed to Dr. Miller by Mr. Walker and it says here
```

1    that a 17-year-old girl had found him through a role game

2    playing that he was live-streaming in October after the FBI

3    interview.

4            Among other things, he admits to asking for pictures.

5    He says that she sent him a picture of her breasts and

6    according to his characterization quote "We had a fight, she

7    thought I was going to expose her".  And this is at least

8    purportedly Mr. Walker's own recitation of events to Dr. Miller

9    for his conduct after the FBI was at his home.

10           THE COURT:  All right.  What I'd like to do is

11   continue this sentencing to a later date.  I want to get a

12   memorandum filed by the government that spells out exactly what

13   the government can say that Mr. Walker did or said after the

14   FBI visit to any victim so that's point number one.

15           Point number two is with respect to MV5, I want to

16   know what the government can say was the wrongful conduct of

17   the defendant toward her at any point, whether it was before or

18   after the FBI warning.  How long would it take you to prepare

19   that memorandum?

20           MS. WU:  Umm, your Honor, I don't want -- I

21   apologize.  You know, some of our files and stuff, the way we

22   store files when it relates to child victims is different, it's

23   not directly on our network, but I'll work as quickly as

24   possible.  If I could have maybe two weeks or something to put

25   this together?  I'd appreciate it.

1           THE COURT:  All right and then I'm going to give the

2      defense an opportunity to respond to it.  Will you need more

3      than two weeks, Ms. Brazile, to respond?

4           MS. BRAZILE:  No, your Honor.

5           THE COURT:  Okay and then in your response, you're

6      going to tell me whatever it is the defendant wants to say

7      about whatever it is in the government's memorandum and then

8      I'll review that.  We will be reconvening for the sentencing.

9           I'll take into account what Ms. Brazile has said

10     regarding the claimed errors in the sentence I pronounced and I

11     will decide at that time whether I'm going to change anything.

12     Do you need any other clarification Ms. Brazile from the

13     government?

14          MS. BRAZILE:  No, your Honor.  I appreciate the

15     opportunity.

16          THE COURT:  All right.

17          MS. WU:  Your Honor, if I could just, umm, I want to

18     make sure that when I file this memorandum, it's helpful to the

19     Court.  So to my understanding the Court isn't looking for a

20     legal argument or other sentencing memorandum, but rather a

21     factual recitation of what the evidence is to address these two

22     points?

23          THE COURT:  Exactly.  I've reviewed all of your legal

24     arguments.  I want to know what the facts are because Ms.

25     Brazile is claiming that somehow the facts haven't been

1   properly presented and that my sentence that I pronounced may

2   be premised on an inaccurate statement of the facts, all right?

3          MS. BRAZILE:  Understood, your Honor.

4          MS. WU:  Thank you, your Honor.

5          THE COURT:  Just one moment.

6          (Pause)

7          THE COURT:  All right, we don't know as we sit here

8   what the new sentencing date is because of the limited

9   reopening of the courthouse, we have to follow a process for

10  selecting a sentencing date so my case manager Ms. Sandusky is

11  going to find out when that date will be and then we'll give

12  you notice of that.  Is there anything else at this time to

13  bring up, Ms. Wu?

14         MS. WU:  No.  Thank you, your Honor.

15         THE COURT:  Ms. Brazile, anything else?

16         MS. BRAZILE:  No, your Honor, thank you.

17         THE COURT:  All right.  I do want to thank

18  Mr. Yarbrough and Ms. Sandusky for their fine work this

19  afternoon and we are adjourned.  Thank you.

20         (Hearing adjourned at 4:24 p.m.)

21                    --    ---    --

22

23

24

25

C E R T I F I C A T E

        I, David B. Yarbrough, Official Court
Reporter, do hereby certify that the foregoing pages
comprise a true and accurate transcript of the
proceedings taken by me in this matter on Monday, June
28th, 2021.


7/23/2021                    /s/ David B. Yarbrough

Date                         David B. Yarbrough,
                             (CSR, RPR, FCRR, RMR)
                             231 W. Lafayette Blvd.
                             Detroit, MI  48226